|     |     |     |
| --- | --- | --- |
| 1   |     |     |
| 2   |     |     |
| 3   |     |     |
| 4   |     |     |
| 5   |     |     |
| 6   |     |     |
| 7   |     |     |
| 8   | UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT SEATTLE | |
| 9   |     |     |
| 10  | PACIFIC INTERNATIONAL GROUT CO., a Washington corporation, | CASE NO. No. 2:12-cv-00778-MJP |
| 11  |     | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS |
| 12  | Plaintiff, v. |     |
| 13  | ANNA VLADIMIROVNA ZINKOVA, aka ANNA ZAIKIN |     |
| 14  |     |     |
| 15  | Defendant, Counter Plaintiff, v. |     |
| 16  | PACIFIC INTERNATIONAL GROUT CO., a Washington corporation, and PATRICK J. STEPHENS and BLISS STEPHENS, and the Marital Community Composed Thereof, |     |
| 17  |     |     |
| 18  |     |     |
| 19  | Counter Defendants. |     |

20

21   This matter comes before the Court on Counter Defendants Pacific International Grout

22  Co. ("PIGCO"), Patrick Stephens ("Stephens"), and Bliss Stephens' motion for summary

23  judgment. (Dkt. No. 7.) Having reviewed the motion, Counter Plaintiff's response (Dkt. No. 17),

24

ORDER CONT'DORDER GRANTING IN PART
AND DENYING IN PART PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT ON
DEFENDANT'S COUNTERCLAIMS- 1

Counter Defendant's reply (Dkt. No. 21), and all the related filings, the Court GRANTS in part and DENIES in part Counter Defendants' motion for summary judgment.

## Background

A. <u>Zinkova and Stephens' Relationship</u>

Counter Defendant PIGCO is a closely held corporation and Counter Defendant Stephens is its President. (Dkt. No. 8-2 at 4.) In May 2000, PIGCO hired Counter Plaintiff Anna Zinkova ("Zinkova") as a receptionist. She was quickly promoted to assistant bookkeeper and then to head bookkeeper by Stephens. (Dkt. No. 7 at 6.) Zinkova worked for the company for five years before being discharged.

Zinkova's counterclaims relate to a sexual relationship she had with Stephens while employed as a bookkeeper. PIGCO maintains that on Zinkova's first day, she received a copy of PIGCO's employee handbook. (Dkt. No. 7 at 6.) The handbook outlined the company's "no harassment" and "open door" policies. (Id.) Stephens also testified that Zinkova's responsibilities as head bookkeeper included training employees on and enforcing the company's equal opportunity and discrimination policies. (Dkt. No. 7 at 6.) Zinkova denies this, claiming instead that she was unaware that there were laws prohibiting sexual harassment in the work place. (Dkt. No. 22-1 at 23.)

In the fall of 2004, Stephens began making unwanted sexual comments to Zinkova. (Dkt. No. 17 at 4). These comments caused her to feel uncomfortable. (Id.) In October 2004, Zinkova and Stephens attended an overnight Leadership Conference in Seattle. (Dkt. No. 7 at 7.) The night before the conference they drove to Seattle together, checked into the hotel, went to dinner, and had sex. (Dkt. No. 8-2 at 15.) The parties disagree about the facts surrounding their initial sexual encounter. Zinkova alleges that Stephens initiated sexual contact. (Dkt. No. 19-1 at 1-2).

1  She claims she asked him not to, but did not scream or call security. (Id.) Stephens, however,

2  alleges that it was Zinkova who solicited his attentions by asking him "Well, will you sleep with

3  me?" (Dkt. No. 8-2 at 19.)

4  Over the course of the next few months their sexual encounters continued. In November

5  2004, Zinkova picked up Stephens at the airport, they went to a hotel, and had sex. (Dkt. No. 19-

6  2 at 6, Dkt No. 8-2 at 30.) Zinkova claims that she "did what he told [her] to do" because

7  Stephens pressured her by saying he provided her a job, security, and assistance in getting her

8  with her green card, and that she now needed to pay for that. (Dkt. No. 19-2 at 6.) Stephens

9  disputes this testimony, claiming instead that Zinkova indicated she wanted to continue the affair

10 by picking him up from the airport and initiating the encounter. (Dkt. No. 8-2 at 28.)

11 The alleged sexual relationship continued into 2005. In December 2004, they took a trip

12 to Denver. (Dkt. No. 19-3 at 2.) When they checked into the hotel Zinkova realized Stephens had

13 booked only one room, but did not object or ask to move rooms. (Dkt. No. 19-3 at 2.) When they

14 got to the room they exchanged gifts and were physical. (Dkt. No. 17 at 16; Dkt. No. 19-3 at 3.)

15 In January of 2005, Stephens picked Zinkova up and took her to work because of the snowy

16 conditions. (Dkt No. 17 at 6.) He allowed the other employees in the office to stay home. (Id.)

17 Despite Zinkova's reluctance, they engaged in sexual conduct at the office. (Id.)

18 Throughout 2005 Stephens continued to ask Zinkova to go on several more trips. (Dkt.

19 No. 17 at 6.) Zinkova attended two trips to San Diego. After the second trip to San Diego in

20 April 2005, Zinkova decided to end the relationship. (Dkt. No. 19-6 at 3.) Zinkova told Stephens

21 that she could not continue the relationship and that she just wanted to do her job. (Dkt. No. 17 at

22 18.) Over the next month, Stephens continued to ask her to join him on trips, but did nothing

23

24

1 when she refused. (Dkt. No. 19-7 at 2.) Then on May 27, 2005, she alleges that because of her
2 continued refusals Stephens discharged her for embezzlement. (Dkt. No. 17 at 16.)
3     After her termination from PIGCO, Zinkova and Stephens stayed in contact. In June
4 2005, she invited him to meet her at Starbucks to discuss job prospects with his company in San
5 Diego. (Dkt. No. 7 at 11.) Zinkova also went to Stephens' house, where they had sex. (Id.)
6 Zinkova alleges that the encounter was by force and that Stephens threatened her by telling her
7 that he could still write to revoke her immigration papers. (Dkt. No. 17 at 8.) Stephens claims the
8 encounter was consensual. (Dkt. No. 8-2 at 44.) Zinkova also testifies that as a result of the stress
9 from these incidents she experiences headaches and stomach pain. (Dkt. No. 19-11 at 12.)

10    B.  Zinkova's Alleged Embezzlement

11    During her time at PIGCO, Zinkova also allegedly embezzled PIGCO funds. Zinkova
12 testifies that this was at the direction of Stephens so that he might avoid paying taxes. (Dkt. No.
13 17 at 3.) After an audit in May of 2005, Stephens discovered Zinkova and her co-worker were
14 both embezzling company funds by writing themselves checks. (Id. at 11.)
15    In July 2005, the Whatcom County Prosecuting Attorney's office charged Zinkova and
16 her co-defendant Melinda Gabino ("Gabino") with sixty counts of theft. (Dkt. No. 7 at 12.)
17 Zinkova pled guilty to only one count of theft for $5000, but agreed that she was jointly and
18 severally liable for $150,000. (Dkt No. 8-3 at 23.) Zinkova claims that even though she is
19 innocent, she accepted the plea offer on the advice of her lawyer. (Dkt. No. 17 at 23.)
20 Furthermore, she alleges that during the course of the investigation Stephens assisted in the
21 prosecution and lied to investigators about whether they had a sexual relationship. (Dkt. No. 17
22 at 22.)
23
24

1  On July 27, 2005 PIGCO sued Zinkova in state court for payment of the criminal judgment. On November 28, 2011, Zinkova filed a voluntary petition for bankruptcy under Chapter 13 of Title 11 in the United States Bankruptcy Court for the Western District of Washington, which stayed the state court litigation. (Dkt No. 22). On December 1, 2011, PIGCO filed a complaint with the Bankruptcy Court, seeking a determination of non-dischargeability as to PIGCO's claims against Zinkova in the state court litigation. (In re Zinkova, Ch. 13 Case No. 11-23688-KAO (W.D. Wash. 2012), Dkt. No. 1.) An Adversary Proceeding was assigned to the Bankruptcy Court. On January 13, 2012, Zinkova filed an answer in the proceeding, asserting counterclaims against PIGCO and Stephens. (Dkt. No. 22 at 19.)

In her answer Zinkova sets forth nine causes of action: (1) sexual harassment in violation Title VII of the Civil Rights Act, 42 U.S.C. §2000e et seq.; (2) sexual harassment in violation of RCW 49.60.030 and RCW 49.60.180 under the Washington Law Against Discrimination Act; (3) retaliation in violation of Title VII and RCW 49.60.010; (4) outrage; (5) sexual assault; (6) battery; (7) malicious prosecution; (8) defamation; and (9) termination in violation of public policy. (Dkt. No. 22-1 at 23-5.)

**Discussion**

A. <u>Legal Standard</u>

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In examining a Defendant's motion for summary judgment, a court must view the facts in the light most favorable to the opposing party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). The moving party has the burden of showing the absence of a genuine issue of material fact. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159

(1970). Once the moving party meets this initial burden, it becomes the responsibility of the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323–324 (1986).

## B. Dismissal of Claims

In her response to PIGCO's motion for summary judgment, Zinkova voluntarily dismissed her counterclaims for defamation and termination in violation of public policy. (Dkt. No. 17 at 21.) Accordingly, the Court DISMISSES these two claims with prejudice.

## C. Defendants' Declarations

As a preliminary matter, PIGCO moves to strike testimony contained in Zinkova's response and the declarations of Sandy Bunney, Liz Westergreeen, Elly Sherman, Brandon Lugar, and Stephanie LeBlanc, because they are irrelevant to Zinkova's counterclaims and the declarants lack personal knowledge of Zinkova's time as an employee. (Dkt. No. 21 at 3.)

Fed.R.Civ.P. 56(e) requires declarations or affidavits must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." As required by 28 U.S .C. § 1746, the declarations provide "under penalty and perjury" certifications, are dated and signed, and attest to personal knowledge. (See Bunney Decl.; Westergreen Decl.; Sherman Decl., Lugar Decl.; and LeBlanc Decl.) Finally, a review of the declarations shows that while some do not directly pertain to Zinkova's time as a bookkeeper, they all establish through personal knowledge what the general bookkeeping practices at PIGCO were. These facts are relevant to whether Zinkova embezzled money as well as her claim for malicious prosecution. Because the declarations are based on personal knowledge and relevant, PIGCO's motion to strike is DENIED.

D. <u>Title VII and WLAD Claims</u>

    1. <u>Title VII Exhaustion</u>

PIGCO argues that Zinkova failed to exhaust her administrative remedies because she did not obtain a right-to-sue letter until after she filed suit in state court. The Court disagrees.

In order to bring a Title VII claim, a claimant must first exhaust her administrative remedies with the EEOC or other approved state agency. 42 U.S.C. §2000e-16(c). If the EEOC does not bring suit based on the charge filed, it must notify the claimant that she has ninety days to bring a civil action. See 42 U.S.C. § 2000e-5(f)(1). This is done through a right-to-sue letter. <u>Surrell v. California Water Serv. Co.</u>, 518 F.3d 1097 (9th Cir. 2008). A claimant may also file an action "prior to receiving her right to sue letter, provided there is no evidence showing that the premature filing precluded the state from performing its administrative duties or that the defendant was prejudiced by such filing." <u>Edwards v. Occidental Chem. Corp.</u>, 892 F.2d 1442, 1445 n. 1 (9th Cir.1990).

Zinkova filed her Title VII counterclaims in state court on November 8, 2005. (Dkt. No. 7 at 14.) She then received her right-to-sue letter eight months later. (Dkt. No. 7 at 15.) This is outside of the ninety day period. Yet, PIGCO does not argue that they were prejudiced by her early filing or that the EEOC investigation was hampered. Therefore, Zinkova exhausted her administrative remedies by obtaining a right-to-sue letter, and the late receipt of the letter does not bar her claims.

    2. <u>Title VII and WLAD on the Merits</u>

PIGCO argues that it is not liable under Title VII and the WLAD for quid pro quo harassment and the creation of a hostile work environment. The Court finds that reasonable minds could differ.

1      Title VII of the Civil Rights Act of 1964 forbids employers from discriminating "because
2 of an individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This is not only limited to economic or
3 tangible discrimination, but also includes sexual harassment. Meritor Sav. Bank, FSB v. Vinson,
4 477 U.S. 57, 67 (1986). An employer may be liable for violations of Title VII for actions
5 constituting sexual harassment by a direct supervisor under two theories: (1) quid pro quo
6 harassment and (2) hostile work environment. Craig v. M & O Agencies, Inc., 496 F.3d 1047,
7 1054 (9th Cir. 2007). It is appropriate to consider Zinkova's Title VII claims with her claims
8 under Washington's sex discrimination law RCW 49.60 et seq. because it parallels that of Title
9 VII. Little v. Windermere Relocation, Inc., 301 F.3d 958, 967 (9th Cir. 2002).

10      a.  Quid Pro Quo Sexual Harassment

11      Zinkova raises a genuine issue of material fact as to her claim for quid pro quo sexual
12 harassment. An actionable claim under a quid pro quo or "tangible employment action" theory
13 requires Zinkova to show that Stephens "explicitly or implicitly conditioned her job, a job
14 benefit, or absence of detriment on her acceptance of sexual conduct." Craig, 496 F.3d at 1054.
15 If Zinkova makes such a showing, the employer is strictly liable for the supervisor's conduct. Id.
16      There is a material dispute of fact as to whether Stephens conditioned her job on sex.
17 Zinkova alleges that Stephens explicitly demanded sex in exchange for wages, benefits, bonuses,
18 gifts, and his support in her immigration case. (Dkt. No. 17 at 13.) Furthermore, she alleges that
19 Stephens' repeatedly commented that he helps her, takes care of her, pays her, keeps her job, and
20 was helping her with her green card and needed "to pay back for that." (Dkt. No. 19-2 at 6.)
21 Lastly, within a month of rejecting several offers to go on trips she was fired from her job. (Dkt.
22 No. 7 at 11.) While she may have also embezzled PIGCO funds, taking these facts in the light
23 most favorable to Zinkova, a jury could find that a reasonable woman would believe her job was
24

conditioned on the acceptance of Stephens's sexual invitations and that PIGCO is liable. Summary judgment on this claim is DENIED.

### b. Hostile Work Environment

PIGCO argues that Zinkova's claim under Title VII for a hostile work environment fails because Stephens' sexual conduct (1) was not offensive or unwelcome, (2) did not occur "because of sex," and (3) did not alter the terms and conditions of the employment. Taking the facts in the light most favorable to the non-moving party, each of these arguments fail.

To establish a hostile work environment, a claimant must prove that: "(1) she was subject to verbal or physical conduct of a sexual nature, (2) this conduct is unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victims employment and create and abusive working environment." Craig, 496 F.3d at 1055. Furthermore, the working environment must be perceived as both subjectively and objectively abusive. Craig, 496 F.3d at 1055. Objective hostility is determined by considering the totality of the circumstances and whether a reasonable person in similar circumstances would perceive the environment as abusive. Id.

PIGCO may be held vicariously liable for a hostile work environment claim when "the harassment is perpetrated by a supervisor with immediate (or successively higher) authority over the employee." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). However, if the employer has not taken a tangible employment action against the employee, then reasonable care becomes available as an affirmative defense. Id. Reasonable care includes the adoption of anti-harassment policies and the prompt correction of sexually harassing behavior. Here, PIGCO took a tangible employment action against Zinkova when it fired her. Thus, even if PIGCO had anti-harassment policies, reasonable care is not an available defense.

1          Zinkova can make a prima facie case for hostile work environment. First, Stephens's
2  conduct was sexual in nature. It is undisputed that the pair had sex on numerous occasions,
3  fulfilling the first prong. (Dkt. No. 17 at 17.) Second, Zinkova establishes a genuine issue of fact
4  as to whether the sexual conduct was welcome. It does "not make sense to try to treat
5  welcomeness as objective, because whether one person welcomes another's sexual proposition
6  depends on the invitee's individual circumstances and feelings." E.E.O.C. v. Prospect Airport
7  Services, Inc., 621 F.3d 991, 997-98 (9th Cir. 2010). Zinkova testified under oath that Stephens
8  advances made her feel uncomfortable, embarrassed, and humiliated. She also alleges that she
9  felt the need to "play along" by giving into his sexual demands, exchanging gifts, texts, and
10 cards. (Dkt. No. 17 at 16.) Even when she said "no," he pressured or forced her to agree. (Dkt
11 No. 19-7 at 53.) While she continued to contact Stephens and slept with him after she was fired,
12 Zinkova testifies that this is because she needed a job and that the sex occurred by force, not
13 consent. (Dkt No. 19-7 at 52-53.) Furthermore, despite the fact that they had sex on several
14 occasions and that she voluntarily agreed, whether Zinkova welcomed the sexual conduct is a
15 question for the jury. Meritor Sav. Bank, FSB, 477 U.S. at 68 (finding that 40 to 50 sexual
16 encounters over years both at and away from the office did not indicate that the sexual conduct
17 was welcomed). To the extent PIGCO relies on Mosher v. Dollar Tree Stores, Inc., 240 F.3d 662
18 (7th Cir. 2001) and Pinney v. Nordstrom, Inc., 122 Wn. App. 1003 (2004), the argument fails.
19 Unlike Mosher and Pinney, Zinkova and Stephens do not hold themselves out as a couple, nor
20 have they lived together for any period of time. See Mosher, 240 F.3d 662 (7th Cir. 2001);
21 Pinney, 122 Wn.App. 1003 (2004). Taking these facts in the light most favorable to the non-
22 moving party, Zinkova establishes a genuine dispute as to whether the conduct was welcome.
23
24

1  Third, Zinkova establishes a genuine issue of fact as to whether Stephens' actions were
2 pervasive and serious enough to amount to "a change in the terms and conditions of
3 employment." See Craig, 496 F.3d at 1056 (finding that repeated sexual comments and a forced
4 kiss were pervasive from the perspective of a "reasonable woman").While Stephens disputes
5 material facts regarding who initiated the first sexual conduct, Zinkova testified that at the
6 Leadership Conference that Stephens forcibly pulled her to the bed, removed her clothes, and
7 later had intercourse with her. (Dkt. No. 19-1 at 1-2.) Rape is "at minimum, an act of
8 discrimination." Brock v. United States, 64 F.3d 1421, 1423 (9th Cir. 1995) (finding that any
9 rape in the employment setting is discrimination based on an employee's sex). Furthermore, this
10 affected her daily life both at and away from work. Zinkova testifies to headaches and stomach
11 pain as a result of the stress from these incidents. (Dkt. No. 19-11 at 12.) When viewed in the
12 light most favorable to Zinkova and from the perspective of a "reasonable woman," a reasonable
13 jury could find that Stephens' actions were pervasive.
14  Under these facts, reasonable minds could find that she did not welcome the actions taken
15 by Stephens and that PIGCO is liable. Thus, summary judgment on this claim is DENIED.
16  E.  Retaliation
17   1.  Prima Facie Case
18  Zinkova's properly asserts a claim for retaliation in violation of Title VII and RCW
19 29.60.010 by establishing a prima facie case and a genuine issue of material fact as to pretext.
20  To establish a prima facie case for retaliation Zinkova must show that (1) she engaged in
21 a statutorily protected activity; (2) an adverse employment action was taken; and (3) there was a
22 causal link between the employee's activity and the employer's adverse action. E.E.O.C. v. Luce,
23
24

1  Forward, Hamilton & Scripps, 303 F.3d 994, 1006 (9th Cir. 2002); Estevez, 129 Wn. App. at
2  797.

3        First, "protected activities include: (1) opposing an unlawful employment practice; and
4  (2) participating in a statutorily authorized proceeding." E.E.O.C., 303 F.3d at 1006. An
5  employee's statement cannot oppose an unlawful employment practice unless it refers to some
6  practice by the employer that is allegedly unlawful. E.E.O.C. v. Crown Zellerback Corp., 720
7  F.2d 1008, 1013 (9th Cir. 1983). Sexual harassment is unlawful under Title VII. 42 U.S.C.
8  §2000e-16(c). Viewed in the light most favorable to Zinkova, Zinkova's refusal to continue the
9  relationship with Stephens was an assertion of her civil right and a protected activity under Title
10 VII and RCW 29.60.010. See Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000)
11 (finding that complaint of sexual harassment was protected activity). Thus, Zinkova's refusal
12 satisfies the first inquiry.

13       Second, Zinkova was subject to adverse employment action. "An action is cognizable as
14 an adverse employment action if it is reasonably likely to deter employees from engaging in
15 protected activity." Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000). Termination is an
16 action that can constitute adverse employment action. Brooks v. City of San Mateo, 229 F.3d
17 917, 928 (9th Cir. 2000). Here, Zinkova was fired within a month of her refusal, fulfilling the
18 second inquiry.

19       Third, Zinkova has established causation between the refusal and her dismissal.
20 Causation "may be inferred from circumstantial evidence, such as the employer's knowledge that
21 the plaintiff engaged in protected activities and the proximity in time between the protected
22 action and the allegedly retaliatory employment decision." Yartzoff v. Thomas, 809 F.2d 1371,
23 1376 (9th Cir. 1987). In some cases, timing alone can establish causation. Villiarimo v. Aloha
24

Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002). Terms ranging from four months to a year and a half are too long. (Id.) Terms of less than three months, however, can be enough to establish causation on their own. See Yartzoff, 809 F.2d at 1376 (holding series of transfers of job duties that began less than three months after he filed his first administrative complaint was sufficient to withstand summary judgment); Miller v. Fairchild Indus., Inc., 797 F.2d at 731-32 (holding that an employer's knowledge of protected activity and the discharge of employees less than two months after negotiation of EEOC settlement agreements was sufficiently probative of a causal link to withstand summary judgment). Here, PIGCO discharged Zinkova approximately one month after her initial refusal to continue the relationship with Stephens. (Dkt. No. 19-7 at 2.) This action is within the range of temporal proximity that can establish causation on its own. Thus, Zinkova satisfies the third and inquiry and makes a valid prima facie case for retaliation.

    2. Pretext

PIGCO establishes a valid reason other than retaliation for termination.

Once a prima facie case is made the burden shifts to the defendant to offer a non-discriminatory motive for the adverse employment action. Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir. 2002) The claimant can rebut this by producing "specific, substantial evidence of pretext." (Id.) "Pretext, too, may be shown by circumstantial evidence, but it must consist of more than a mere refutation of the employer's legitimate reason and a mere assertion that the discriminatory reason be the cause of the firing." (Id.)

Here, PIGCO properly rebutted Zinkova's claim for retaliation with evidence of a legitimate non-discriminatory motive for Zinkova's discharge. PIGCO establishes that Zinkova not only embezzled PIGCO funds, but that she also voluntarily pled guilty to a count of theft for

1   $5000. (Dkt. No. 17 at 3, Dkt. No. 8-3 at 23.) This evidence provides a non-discriminatory

2   motive for PIGCO's termination of Zinkova.

3      Zinkova, however, creates a genuine issue of fact as to whether the cause for termination

4   was pretext. "Courts have recognized that in discrimination cases, an employer's true motivations

5   are particularly difficult to ascertain, thereby making such factual determinations generally

6   unsuitable for disposition at the summary judgment stage." Miller v. Fairchild Indus., Inc., 797

7   F.2d 727, 732-33 (9th Cir. 1986). In establishing pretext, the claimant is not required to introduce

8   evidence beyond that already offered to establish her prima facie case, although she may provide

9   additional proof. Miller, 797 F.2d at 732. "In some cases, temporal proximity can by itself

10  constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie

11  case and the showing of pretext." Dawson v. Entek Int'l, 630 F.3d 928, 937 (9th Cir. 2011);

12  Miller, 797 F.2d at 732. Here, Zinkova already established a close temporal proximity of less

13  than one month between her initial refusal to continue the relationship and the time of her

14  termination. (Dkt. No. 17 at 3, Dkt. No. 8-3 at 23.) She also alleges that Stephens engaged in

15  unethical accounting practices and directed her and her co-worker to write the checks. (See Decl.

16  Mumford, Bunney, Westergreeen.) She also alleges that she only plead guilty to embezzlement

17  on the advice of her lawyer. (Dkt. No. 17 at 23.) Taking these facts in the light most favorable to

18  Zinkova, she presents a genuine issue of fact as to whether the termination was based on pretext.

19  Thus, the Court DENIES summary judgment on this claim.

20   F.  Outrage

21  PIGCO argues that Zinkova's intentional tort claims should be dismissed because they rely on

22  the same facts used to support a violation of RCW 49.60. PIGCO correctly argues this for

23  outrage, but not for assault or battery. A claim is duplicative and must be dismissed under

24

Washington law when the plaintiff asserts the same factual basis for two claims. Jacobson v. Washington State Univ., CV-05-0092-FVS, 2007 WL 26765, at *11 (E.D. Wash. Jan. 3, 2007). Washington courts have dismissed outrage claims as duplicative of discrimination claims because Title VII already allows for damages for emotional injuries on the same facts. See Francom v. Costco Wholesale Corp., 98 Wn. App. 845, 864 (2000) (dismissing negligent infliction of emotional distress claim as duplicative of LAD claim); Anaya v. Graham, 89 Wn. App. 588, 596 (1998) (dismissing outrage claim as duplicative). Because it is duplicative of the Title VII claims, summary judgment on the claim for outrage is GRANTED.

E. Assault and Battery

PIGCO argues that Zinkova's assault and battery claims fail two reasons: (1) the response to the motion was the first time Zinkova alleged assault and battery based on incidents occurring after she was fired and (2) she cannot prove she did not consent. The Court will not reach either argument, because it cannot determine whether Zinkova's claims are based on her pre-employment or post employment contact with Stephens.

F. Malicious Prosecution

PIGCO argues that Zinkova's claim for malicious prosecution fails (1) on the merits and (2) because she is collaterally estopped from asserting her counterclaim. (Dkt. No. 21 at 12, 13.) The Court does not need to reach the collateral estoppel claim because Zinkova's claim fails on the merits.

PIGCO argues that Zinkova cannot prove that there was a lack of probable cause. To maintain an action for malicious prosecution, the claimant must allege and prove all elements. "Although all elements must be proved, malice and want of probable cause constitute the gist of a malicious prosecution action." Hanson v. City of Snohomish, 121 Wn.2d 552, 558 (1993).

1 | Thus, establishing probable cause is a complete defense to an action for malicious prosecution.

2 | Id. A conviction, even if later reversed, is conclusive evidence of probable cause unless it can be

3 | shown that conviction was obtained by fraud, perjury or other corrupt means. Id. at 560.

4 |     Here, Zinkova alleges that Stephens failed to fully and truthfully convey all relevant

5 | facts. (Dkt. No. 17 at 22.) In support of this assertion Zinkova notes that Stephens withheld

6 | information pertaining to their sexual relationship during his first interview and that during the

7 | second he lied by denying the sexual conduct completely. (Id.) While Stephens may have

8 | committed perjury it is immaterial because the conviction was not obtained through perjury. The

9 | conviction was obtained through Zinkova's voluntary plea of guilty.

10 |     Therefore, the Court GRANTS summary judgment on this claim.

**Conclusion**

12 |     The Court GRANTS summary judgment on the claims for malicious prosecution and

13 | outrage. It DENIES summary judgment on the claims under Title VII and WLAD. The Court

14 | orders Zinkova to specify which events her assault and battery claims relate to within 10 days of

15 | this order. As to PIGCO's motion to strike, the Court DENIES the motion because the

16 | information contained in the declarations is based on personal knowledge and relevant to the

17 | claims. Finally, the Court DISMISSES the claims for defamation and termination in violation of

18 | public policy.

19 |     The clerk is ordered to provide copies of this order to all counsel.

20 |     Dated July 25, 2012.

*[signature]*
Marsha J. Pechman
United States District Judge